*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

---

*In re* ESTATE OF VERNON LEROY STEPHENSON.

---

| | |
|---|---|
| CHRISTINA SMITH, G. SCOTT SMITH, and STEPHEN SMITH, | UNPUBLISHED<br>May 18, 2023 |
| Appellees/Cross-Appellants, | |
| v | No. 360453<br>Genesee Probate Court |
| RANDAL STEPHENSON, Personal Representative of the ESTATE OF VERNON LEROY STEPHENSON, | LC No. 15-202160-DA |
| Appellant/Cross-Appellee. | |

---

*In re* STEPHENSON FAMILY TRUST.

---

| | |
|---|---|
| CHRISTINA SMITH, G. SCOTT SMITH, and STEPHEN SMITH, | |
| Appellees/Cross-Appellants, | |
| v | No. 360513<br>Genesee Probate Court |
| RANDAL STEPHENSON, Successor Trustee of the STEPHENSON FAMILY TRUST, | LC No. 17-208550-TV |
| Appellant/Cross-Appellee. | |

---

Before: MARKEY, P.J., and MURRAY and FEENEY, JJ.

PER CURIAM.

-1-

Appellant, Randal Stephenson (Stephenson), as Personal Representative of the Estate of Vernon Leroy Stephenson (the Estate), appeals by right in Docket No. 360453. And Stephenson, as Successor Trustee of the Stephenson Family Trust (the Trust), also appeals by right in Docket No. 360513. In a single appellate brief covering both docket numbers, Stephenson challenges the probate court's opinion and judgment and its order on reconsideration and clarification that were entered following a bench trial. Appellees, Christina Smith, G. Scott Smith, and Stephen Smith (collectively the Smiths), cross-appeal one aspect of the probate court's rulings. This Court consolidated the two appeals. *In re Stephenson Estate; In re Stephenson Family Trust*, unpublished order of the Court of Appeals, entered March 8, 2022 (Docket Nos. 360453 and 360513). We affirm in part and reverse and remand in part.

## I. EARLIER PROCEEDINGS AND OPINION BY THIS COURT

In earlier proceedings, the probate court granted partial summary disposition in favor of the Smiths, and Stephenson and the Smiths appealed the ruling to this Court. This Court affirmed in part and reversed and remanded in part. *In re Vernon Stephenson Estate*, unpublished per curiam opinion of the Court of Appeals, issued July 20, 2020 (Docket Nos. 348207 and 348210); unpub op at 9. We incorporate by reference this Court's previous opinion, which set forth the basic facts and procedural history of the litigation up to and including summary disposition. We will not repeat those facts and that history here. This Court concluded that Stephenson's durable power of attorney (DPOA) and the Trust gave Stephenson the authority "to make limited gifts to himself and to third parties." *Id.* The panel further ruled that the probate court erred by determining that Stephenson's "power to make distributions was limited by the gift-giving provision of the Trust[.]" *Id.* The Court explained that in addition to authorizing Stephenson "to make gifts, the Trust gave [Stephenson] discretion to distribute the Trust's assets for the benefit of the beneficiaries." *Id.* But the discretion was not unlimited, and the Court noted that there remained "factual questions about whether the distributions and gifts [Stephenson] made under the terms of the Trust violated Michigan law." *Id.* This Court also held that the probate court did not err by finding that a promissory note pursuant to which Stephenson and his wife agreed to repay the decedents[1] $120,000 plus interest was not discharged or forgiven and was subject to collection by the Estate. *Id.* at 2, 9.

## II. REMAND PROCEEDINGS

On remand, a stipulated order was entered on November 17, 2020, in which the parties identified 15 issues to be resolved at trial. A two-day bench trial was conducted on August 19 and 20, 2021. Numerous documents were admitted into evidence, and testimony was provided by Stephenson, Christina Smith (Christina), and L. David Lawson, who was an attorney who drafted a 2014 amendment to the Trust. Following the trial, the probate court issued an extensive 26-page opinion and order in October 2021, which was later amended in February 2022 to correct a

---

[1] The decedents are Kathleen and Vernon Stephenson, who were Stephenson's and Christina's parents. Kathleen died on March 6, 2014. Vernon was declared incompetent by two doctors within a couple of weeks of Kathleen's death, and he died a little over a year later on April 6, 2015. These cases were driven by estate planning documents executed by Vernon and Kathleen in 2010.

nonsubstantive typo. In February 2022, the probate court also issued an order on motions filed by Stephenson and the Smiths seeking clarification and reconsideration. We shall discuss the testimony and documentary evidence presented at trial and the probate court's reasoning and rulings in the context of our analysis where pertinent to the issues raised on appeal. As a cursory summarization, the probate court ruled that Stephenson violated the Trust with respect to distributions made to himself and his children following Vernon's death, that those invalid distributions constituted statutory conversion justifying treble damages, that a $10,000 loan to Stephenson had not been discharged or forgiven, that Stephenson was to be removed as personal representative and trustee and replaced by Christina in those roles, that the Smiths were entitled to attorney fees and costs paid from Trust assets, and that the 2014 amendment to the Trust was valid and enforceable.

## III. PERTINENT TRUST PROVISIONS

The focus of this litigation was on Article Four, Sections D and G of the 2010 Trust, which provided as follows:

D. **INCAPACITY OF THE SURVIVING TRUSTMAKER OR BOTH TRUSTMAKER(S):**

If the surviving Trustmaker or both of us are replaced as trustee(s) of this trust as provided above, the successor trustee(s) shall use the trust estate for our benefit and for the benefit of anyone else authorized by Article One or Two of this living trust. Any income not paid to or for our benefit or to or for the benefit of other authorized beneficiaries shall be added to the principal.

The foregoing shall also apply to distributions by the trustee(s) whenever the surviving Trustmaker or both of us who are not serving as trustee(s) become incapacitated. . . . .

G. **GIFTING AND LOANS:**

If the surviving Trustmaker or both of us are replaced as trustee(s) of this trust as provided above, the successor trustee(s) shall be fully authorized to make gifts from this trust to third parties or to the successor trustee(s) as individual(s) as determined in the sole discretion of the successor trustee(s), provided said gifts qualify for the annual exclusion under Sections 2503(b), 2503(c) and 2503(e) of the Internal Revenue Code [IRC] of 1986, as subsequently amended.[2]

---

[2] IRC § 2503(b)(1) provides for an exclusion from gift tax the first $10,000 in annual gifts made to a person. 26 USC 2503(b)(1). Pursuant to the application of an inflation-adjustment formula, the annual exclusion during the pertinent 2014-2016 period was $14,000. 26 USC 2503(b)(2). IRC § 2503(c), which concerns transfers to persons under the age of 21, was not implicated in this case. 26 USC 2503(c). IRC § 2503(e) provides that a transfer of property by gift is not treated as

Additionally, if the Trustmakers keep a record of specific loans to beneficiaries made during the Trustmakers' lifetimes, and desire that said loans be considered advances against inheritance, the Trustmakers will attach a list so stating, and hereby direct the successor trustee(s) to deduct the loan amounts from each respective share that the named beneficiary would have received. Further, Trustmakers hereby forgive any loans that exceed any beneficiary's share of trust proceeds.

Also critical to this case is Article One, Section J of the Trust, which stated, in part, that "[u]pon the death of the survivor of us, our successor trustee(s) shall take charge of the assets then remaining in this trust and distribute them according to the plan of distribution in Article Two of this Declaration of Trust document."[3] Article Two, Section A, Subsection 2.d. provided for the distribution of the net proceeds of the Trust in accordance with Attachment A.[4] And Attachment A awarded 50% of the Trust estate to Stephenson, 25% of the Trust estate to Christina, and 25% of the Trust estate to the four grandchildren, divided into equal shares. Under a February 2014 amendment to the Trust drafted by attorney Lawson and executed by Kathleen Stephenson, the distribution of the net proceeds of the Trust "after the death of the surviving trustmaker" was modified.[5] Now, Stephenson was awarded 50% and Christina was awarded 50% of "[a]n undivided one-half of the Trust assets," and, with respect to the other undivided one-half of the Trust assets, Stephenson was awarded 50%, Christina was awarded 25%, and the four grandchildren were awarded 25% in equal shares. The net effect still awarded Stephenson 50% of the total Trust estate, but Christina's share of the total Trust estate was increased to 37.5%. The

---

a taxable event for purposes of gift tax when the payment or gift is made to an educational organization for the education or training of an individual or made to any person who provides medical care to an individual when the payment was for such medical care. 26 USC 2503(e)(1) and (2).

[3] Another portion of Article One, Section J that we will address and which the previous panel examined, provided:

> We hereby designate ourselves as the primary beneficiaries of this trust. As long as we or the survivor of us shall live, we or the survivor of us will have the exclusive right to the use and benefit of the income and the assets of this trust, except as to the spouse's one half of assets if assets are partitioned pursuant to the preceding provisions of this Article One.

[4] Article Two, Section A, Subsection 1 required the successor trustee, Stephenson, upon the death of the survivor of Kathleen and Vernon, to first pay debts, bills, and expenses, including funeral expenses, incurred by or in relation to Kathleen and Vernon.

[5] At the same time that the Trust was amended, Kathleen also executed a new DPOA, revoking her prior DPOA. Under the new DPOA, Christina, as well as Stephenson, were granted authority to act as Kathleen's attorney-in-fact.

changes were made directly to Attachment A. The probate court's ruling that the amendment was valid is one of the issues raised on appeal.

## IV. ANALYSIS

### A. STANDARDS OF REVIEW AND GOVERNING PRINCIPLES

We review for an abuse of discretion a probate court's dispositional rulings following an evidentiary hearing or trial. *In re Portus*, 325 Mich App 374, 381; 926 NW2d 33 (2018). A probate court abuses its discretion when it makes a decision that falls outside the range of reasonable and principled outcomes. *Id.* An abuse of discretion necessarily occurs when the probate court makes an error of law. *Id.* This Court reviews for clear error the factual findings underlying the probate court's ruling. *Id.* A factual finding is clearly erroneous when this Court is left with a definite and firm conviction that a mistake was made, even when there is evidence to support the court's finding. *Id.* " 'The reviewing court will defer to the probate court on matters of credibility, and will give broad deference to findings made by the probate court because of its unique vantage point regarding witnesses, their testimony, and other influencing factors not readily available to the reviewing court.' " *In re Conservatorship of Brody*, 321 Mich App 332, 336; 909 NW2d 849 (2017), quoting *In re Erickson Estate*, 202 Mich App 329, 331; 508 NW2d 181 (1993). "We review de novo a probate court's construction and interpretation of the language used in a will or a trust." *In re Stillwell Trust*, 299 Mich App 289, 294; 829 NW2d 353 (2012).[6]

A court's lone objective when construing the language of a trust is to ascertain and give effect to the settlor's intent. *Id.* Absent an ambiguity, the words contained in a trust document serve as the best indicators when attempting to discern the meaning of the trust and its intended operation. *Id.* The intent of the settlor is gauged from the trust document itself. *In re Kostin Estate*, 278 Mich App 47, 53; 748 NW2d 583 (2008). A trust must be read as a whole, harmonizing its terms with the intent expressed when possible. *In re Brown Estate*, 312 Mich App 684, 694; 880 NW2d 269 (2015). "In sum, a court must enforce the plain and unambiguous terms of a trust as they are written." *Id.*

"If ambiguity exists, the court must look outside the document in order to carry out the settlor's intent, and may consider the circumstances surrounding the creation of the document and the general rules of construction." *Kostin Estate*, 278 Mich App at 53. "The rules of construction applicable to wills also apply to the interpretation of trust documents." *In re Reisman Estate*, 266 Mich App 522, 527; 702 NW2d 658 (2005). And in *In re Kremlick's Estate*, 417 Mich 237, 240-

---

[6] "An appeal from the probate court is on the papers filed and a written transcript of the proceedings in the probate court or on a record settled and agreed to by the parties and approved by the court." MCR 5.802(B)(1); see also MCL 600.866(1). An appeal from the probate court "shall not be tried de novo." MCL 600.866(1). In estate proceedings, "[a]ppellate review, including the right to appellate review or interlocutory appeal and provisions as to time, manner, notice, appeal bond, stays, scope of review, record on appeal, briefs, arguments, and the power of the appellate court, is governed by the revised judicature act of 1961 and by supreme court rule." MCL 700.1305.

241; 331 NW2d 228 (1983), our Supreme Court, addressing alleged ambiguities in a will, observed:

> A patent ambiguity exists if the uncertainty as to meaning appears on the face of the instrument, and arises from the defective, obscure, or insensible language used. A latent ambiguity, on the other hand, arises where the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or extraneous evidence creates the possibility of more than one meaning.
>
> [This] Court has held that in interpreting contracts where an ambiguity may exist, extrinsic evidence is admissible: (1) to prove the existence of ambiguity; (2) to indicate the actual intent of the parties; and (3) to indicate the actual intent of the parties as an aid in construction.
>
> These rules are equally applicable to interpreting wills. Thus, not only may extrinsic evidence be used to clarify the meaning of a latent ambiguity, but it may be used to demonstrate that an ambiguity exists in the first place and to establish intent. [Quotation marks and citations omitted.]

## B. GIFTS AND DISTRIBUTIONS MADE BY STEPHENSON AFTER HIS FATHER'S DEATH

### 1. THE PROBATE COURT'S RULING

In its opinion and order, the probate court found that distributions and gifts Stephenson made before both his parents, Kathleen and Vernon, were deceased, i.e., during either parent's lifetime, "were done so validly and complied with the unambiguous terms of the Trust, via Article Four, Sections D or G, as limited by Michigan law—specifically, IRC 2503(b), (c), (e)." Those distributions and gifts are not directly at issue in this appeal. But the probate court next determined that Stephenson acted contrary to and in violation of Article One, Section J of the Trust, Article Two of the Trust, and the Trust's Attachment A, with respect to distributions and gifts made after Vernon's death, which was after Kathleen had already died. The probate court ruled:

> Approximately $54,787.98 was disbursed/gifted by Randal Stephenson to himself and/or his children after . . . Vernon's death. While Randal claimed he acted as trustee as directed by his mother's wishes—and as advised by Attorney Lawson—such is contrary to the clear and unambiguous terms of the Trust, and more specifically, Article One, Section J and Article Two of the Trust.
>
> [M]oreover, $54,787.98 shall be repaid to the Trust by Randal Stephenson pursuant to MCL 700.7901(2)(c), as . . . Randal's actions amounted to a breach of his fiduciary duties under MCL 700.7801; MCL 700.7706; MCL 700.7815; and MCL 700.7901. [Footnotes omitted.]

-6-

In its order on the parties' motions for clarification and reconsideration, the probate court continued to find that Stephenson "did not have the authority to make gifts/distributions after Vernon Stephenson's death, pursuant to the terms of the Trust[.]"

## 2. THE PARTIES' ARGUMENTS

On appeal, Stephenson argues that the clear and unambiguous language of the Trust gave him, as successor trustee, the discretionary authority to make gifts and distributions to himself and his children after Vernon's death. Stephenson contends that all of the distributions and gifts that he made to himself and his children were consistent with and authorized by Sections D and G of Article Four of the Trust, as well as complying with the limits, if any, outlined in IRC § 2503(b), (c), and (e). Stephenson maintains that it makes no difference whether the distributions and gifts were made before *or after* his father's death. He quotes at length trial testimony allegedly demonstrating full compliance with the Trust and the IRC, arguing that there was no evidence to the contrary. Moreover, Stephenson posits that, as directed by this Court in the earlier appeal, he established that the distributions or gifts made in his role as successor trustee to himself satisfied MCL 700.7815(3)(a). This statutory provision states that "[a] person other than a settlor who is a trust beneficiary and trustee of a trust that confers on the trustee a power to make distributions pursuant to a discretionary trust provision to or for the trustee's benefit may exercise the power only in accordance with an ascertainable standard." Stephenson claims that the ascertainable standard was health, education, support, and maintenance, which served as the purposes for the transfers to himself.[7]

Stephenson argues that the probate court ignored his position on the matters discussed above, which position was consistent with this Court's previous opinion, and simply determined as a matter of law that all distributions and gifts made after the death of Vernon Stephenson were contrary to the plain language of the Trust, specifically Article One, Section J and Article Two. Stephenson contends that there is no language in the entire Trust suggesting or indicating that Article Four, Sections D and G are no longer applicable after the death of the surviving settlor. And the probate court did not cite any such language in making its ruling but instead relied on Article One, Section J. Stephenson, prefacing his quotation of Article One, Section J by noting that it "simply states," does not provide any explanation why it would not apply. Stephenson proceeds to maintain that the probate court effectively disregarded this Court's earlier opinion by not reading the Trust as a whole and by failing to harmonize the provisions of the Trust so as to honor the intent of Kathleen and Vernon.

Stephenson emphasizes that the probate court was obligated to determine and give effect to the intent of Stephenson's parents as expressed in the plain language of the Trust given that there are no patent or latent ambiguities in the Trust. He additionally argues that courts should not

---

[7] MCL 700.7103(b) defines the term "ascertainable standard" as "a standard relating to an individual's health, education, support, or maintenance within the meaning of section 2041(b)(1)(A) or 2514(c)(1) of the internal revenue code of 1986, 26 USC 2041 and 2514."

hyper-analyze and over-scrutinize trust language that is plain and clear. Stephenson summarizes his stance as follows:

> The Probate Court's ruling is a reversible error because it completely disregards the applicable language in both Article Four Section D and Article Four Section G, which authorized Randal to make the at-issue gifts and distributions in the manner proscribed. Instead, the Probate Court incorrectly inferred that these provisions in Article Four have no effect upon the death of the surviving settlor, which is contrary to the clear and unambiguous terms of the Trust.
>
> Additionally, the Probate Court disregarded this Court's ruling that Randal's gifts and distributions were permissible under the language of [the] Trust[] as long as they complied with the ascertainable standard requirement set forth in MCL 700.7815. . . .

We note that Stephenson does not specifically argue that the law-of-the-case doctrine applies, nor does he engage in any analysis of caselaw concerning the law of the case.

The Smiths respond that the probate court correctly ruled that the plain and unambiguous language of the Trust, specifically Article One, Section J and Article Two, Section A, including Attachment A (as amended), required Stephenson to make transfers consistent with Attachment A when and after Vernon died. The Smiths emphasize that "[t]he total gifts undertaken by [Stephenson] over the period of time from 2014 to 2016 for himself and his children, and to the exclusion of any other beneficiaries under the Trust, totaled $201,681.30." The Smiths assert that instead of taking care of his parents first, Stephenson took care of his own and his children's needs.[8] They further claim that to the extent that Stephenson is arguing that the Trust was ambiguous, the evidence presented at trial conclusively established that Vernon and Kathleen never gifted their assets during their lifetime and that the gifting did not commence until Stephenson assumed his fiduciary capacity as a successor trustee.

### 3. DISCUSSION AND RESOLUTION

Although the parties do not discuss the law-of-the-case doctrine, we conclude that the doctrine is implicated in this case to a limited extent and must be taken into consideration. In *Grievance Administrator v Lopatin*, 462 Mich 235, 259-260; 612 NW2d 120 (2000), our Supreme Court explained the nature of the doctrine:

> Under the law of the case doctrine, if an appellate court has passed on a legal question and remanded the case for further proceedings, the legal questions thus determined by the appellate court will not be differently determined on a subsequent appeal in the same case where the facts remain materially the same. The appellate court's decision likewise binds lower tribunals because the tribunal may not take action on remand that is inconsistent with the judgment of the appellate

---

[8] The Smiths note that after Stephenson made $54,787.98 in distributions and gifts following the death of his father, the Estate or Trust was left with $618.74.

court. Thus, as a general rule, an appellate court's determination of an issue in a case binds lower tribunals on remand and the appellate court in subsequent appeals. [Quotation marks and citations omitted.]

We agree with the probate court that pursuant to the plain and unambiguous language of Article One, Section J; Article Two, Section A, Subsection 2.d.; and Attachment A (either the 2010 or 2014 version), following Vernon's death in April 2015, the successor trustee, Stephenson, was obligated to disburse the net proceeds of the Trust estate to the beneficiaries in accordance with Attachment A. We disagree with Stephenson's contention that Article Four, Sections D and G authorized his distributions and gifts to himself and his children after the death of his father. But it is necessary to examine the earlier opinion on this subject to confirm that our ruling does not undermine the law-of-the-case doctrine.

This Court did hold that Stephenson was authorized by and had discretion under Article Four, Sections D and G of the Trust to make distributions and gifts to himself and his children although the authority or discretion was not unfettered and was limited by the Michigan Trust Code (MTC), MCL 700.7101 *et seq. In re Vernon Stephenson Estate*, unpub op at 4-6. The opinion can be construed as determining that Stephenson had the power to make distributions or gifts to himself and his children under Article Four, Sections D and G of the Trust before and after Vernon's death, especially considering that the post-death transfers had occurred by the time of the prior appeal. That said, there is no indication in the previous opinion that this Court entertained or resolved the specific issue whether distributions or gifts made after Vernon's passing were valid in light of Article One, Section J; Article Two, Section A, Subsection 2.d.; and Attachment A. Law of the case only applies to legal questions actually determined and passed on by a panel of this Court. *Grievance Administrator*, 462 Mich at 259-260.

Moreover, this Court did examine Article One, Section J, although it did so in a different context and in regard to a different portion of Section J. *In re Vernon Stephenson Estate*, unpub op at 5-6. As reflected in footnote 3 of the instant opinion, Article One, Section J indicated, in part, that Vernon and Kathleen were the primary beneficiaries of the Trust and that they held the exclusive right to the use and benefit of the Trust's income and assets. This Court discussed the interplay between Article One, Section J and Article Four, Sections D and G, stating and ruling:

[The Smiths] next argue that Article One, Section J creates an ambiguity when read in combination with Article Four, Sections D and G. Article One, Section J states that the decedents "will have the exclusive right to the use and benefit of the income and assets of this trust" as long as they are alive. While it is a closer question of whether Article One, Section J creates an ambiguity in the Trust, we conclude that it does not. [The Smiths are] contending that Article One, Section J creates a patent ambiguity, which exists if an uncertainty concerning the meaning appears on the face of the instrument and arises from the use of defective, obscure, or insensible language. Article Four, Sections D and G are clearly intended to apply in the event that the Trustees become incapacitated. There is nothing defective, obscure, or insensible about the language used in those provisions. Likewise, there is nothing defective, obscure, or insensible about the language used in Article One, Section J, and that provision is clear that the Trust is created for the use and benefit of the Trustees (the decedents) as long as they are alive. Though Article One,

Section J of the Trust does not state an exception to its terms if the Trustees become incapacitated, we must read the trust as a whole and, if possible, harmonize the provisions to reflect the intent of the decedents. When reading the Trust as a whole, it is clear that the decedents' intent was for them to retain exclusive control except in the event that they became incapacitated. We therefore conclude that there is no patent ambiguity in the Trust. [*In re Vernon Stephenson Estate*, unpub op at 5-6 (quotation marks and citations omitted).]

Thus, the earlier panel rejected the argument proffered by the Smiths that Article One, Section J limited Stephenson's authority under Article Four, Sections D and G considering that Stephenson's transfers took place after his mother's death on March 6, 2014, and his father's incapacitation a short time later.

Here, the probate court focused on a different portion of Article One, Section J, which provided that "[u]pon the death of the survivor of us, our successor trustee(s) shall take charge of the assets then remaining in this trust and distribute them according to the plan of distribution in Article Two of this Declaration of Trust document." This then leads to the application of Attachment A and its required disbursements. The probate court's construction of the relevant provisions in Articles One, Two, and Four, along with Attachment A, actually harmonizes the various provisions, especially in light of this Court's earlier opinion. Taking into consideration the previous opinion by this Court and the probate court's ruling now at issue, we conclude that Article Four, Sections D and G authorized Stephenson to make the distributions and gifts to himself and his children after his father was incapacitated but that authority ceased when Vernon died a little over one year later, at which time Article One, Section J; Article Two, Section A, Subsection 2.d.; and Attachment A were triggered. Although Stephenson argues that there is nothing in Article Four, Sections D and G of the Trust, or anywhere in the Trust, that limited the application of Sections D and G to a period before Vernon and Kathleen had both died, Article One, Section J clearly created that limitation.

Moreover, even focusing our attention solely on Article Four, Sections D and G, we find that these provisions can reasonably be construed as covering only those circumstances in which, for whatever reason (such as incapacitation), the successor trustee becomes authorized to act even though one or both settlors remain alive. Importantly, were we to interpret Article Four, Sections D and G in the manner Stephenson urges, Article One, Section J; Article Two, Section A, Subsection 2.d.; and Attachment A would essentially be rendered meaningless. See *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 468; 663 NW2d 447 (2003) ("[C]ourts must . . . give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory."). Effectively, Stephenson's discretion to make distributions and gifts ended when Vernon died. The Smiths were entitled to their shares of the Trust's assets under Attachment A upon Vernon's death. In sum, we conclude that the probate court properly construed the Trust and that its ruling was not precluded by the law-of-the-case doctrine. In fact, the probate court's ruling was consistent with this Court's prior opinion and demonstrated obedience to the plain and unambiguous language of the Trust. We therefore reject Stephenson's argument that Article Four, Sections D and G gave him the power to make the distributions and gifts after Vernon's death.

Because the plain and unambiguous language of the Trust supported the probate court's ruling and because settlor intent is gauged from the trust document itself when the language is plain and unambiguous, the myriad arguments raised and posed by Stephenson necessarily fail. There is, however, an additional matter that must be broached. While Stephenson lacked the authority under Article Four, Sections D and G to make the distributions and gifts following Vernon's death, application of Attachment A via Article One, Section J and Article Two, Section A, Subsection 2.d. required disbursements some of which *would still go to Stephenson and his children.* Stephenson himself was entitled to 50% of the net Trust estate upon his father's death, regardless whether the amendment of Attachment A applied or not, and Stephenson's two children were entitled, collectively, to either 12.5% or 6.25% of the Trust's assets, depending on whether the amendment of Attachment A was enforceable. The probate court observed that Stephenson owed monies to the Trust itself for his improper transfers of Trust assets which had to be fully repaid to the Trust and "not simply offset by his own share." For purposes of the instant issue, we simply hold that the probate court properly construed the pertinent language in the Trust. The issue of "offsets" is not technically raised as an issue on appeal although it indirectly impacts our later discussion and analysis of the conversion damages the probate court awarded.

## C. VERBAL AGREEMENT FOR $10,000 LOAN

### 1. THE PROBATE COURT'S RULING

The probate court tackled the question whether a $10,000 loan from Vernon and Kathleen to Stephenson by verbal agreement[9] had been forgiven or discharged or whether the agreement remained valid and enforceable. The probate court found that the loan had not been repaid or discharged. The court concluded that there was no consideration given for any purported discharge; therefore, a writing was required by statute to establish a modification or discharge of the obligation to repay the loan. Stephenson, however, provided no evidence of such a writing. The probate court rejected Stephenson's arguments under the Uniform Commercial Code and Article Four, Section G of the Trust, steadfastly ruling that the loan had not been forgiven.

In its order on the parties' motions for clarification and reconsideration, the probate court did not modify its ruling that the $10,000 loan, as well as the $120,000 promissory note on an earlier loan to Stephenson from his parents, remained due and owing. But the court now added that repayment by Stephenson of the $120,000 loan would be subject to "a designated interest rate of five percent per annum" as reflected in the language of the note; no interest was to be charged in regard to the repayment of the $10,000 loan.

---

[9] The loan was evidenced by a letter from Stephenson to his parents dated November 2, 2010. In response to his parents' willingness to loan him the $10,000, Stephenson wrote:

> Thank you so much for doing this. This will get us through until the end of the month, when I will receive a large check from my new firm. We will pay you back immediately.

## 2. THE PARTIES' ARGUMENTS

Stephenson argues that the $10,000 loan was canceled and discharged; therefore, the debt was not an asset of the Trust or the Estate. Stephenson acknowledges that there was no writing discharging or forgiving his obligation under loan agreement. Stephenson contends that during the four years between when the loan was made and Kathleen's death, neither his mother nor his father ever requested repayment or hinted that repayment was necessary—in writing or verbally, and no payments on the loan were ever made. Stephenson further maintains that under Article Four, Section G of the Trust, his mother and father were to create and attach a list of any loans to beneficiaries that remained unpaid and owing, yet there was no attachment pertaining to the $10,000 loan. We note that Stephenson does not directly address or assail the reasoning by the probate court in determining that the loan remained outstanding.

The Smiths essentially agree with the probate court's analysis of this argument. They also argue that there was testimony that Kathleen complained about her son's failure to repay the $10,000 and $120,000 loans, always promising to pay her back when he closed on the next big deal. With respect to Stephenson's argument under Article Four, Section G and the failure to attach a list of outstanding loans, the Smiths state that Kathleen retained the $120,000 promissory note and the correspondence from Stephenson relating to the $10,000 verbal loan.

## 3. DISCUSSION AND RESOLUTION

We first determine that because Stephenson fails to address the reasoning and grounds given by the probate court in support of its ruling that the $10,000 loan was not discharged or forgiven, Stephenson is not entitled to relief on the issue. See *Denhof v Challa*, 311 Mich App 499, 521; 876 NW2d 266 (2015) ("When an appellant fails to dispute the basis of a lower court's ruling, we need not even consider granting the relief being sought by the appellant."). Moreover, even on substantive review, Stephenson's arguments do not merit reversal. MCL 566.1 provides:

> An agreement hereafter made to change or modify, or to discharge in whole or in part, any contract, obligation, or lease, or any mortgage or other security interest in personal or real property, shall not be invalid because of the absence of consideration: Provided, That the agreement changing, modifying, or discharging such contract, obligation, lease, mortgage or security interest shall not be valid or binding unless it shall be in writing and signed by the party against whom it is sought to enforce the change, modification, or discharge.

Under MCL 566.1, a modification or discharge of a loan or note is only valid if supported by consideration or, in the absence of consideration, established by a writing. *Mich Nat'l Bank of Detroit v Holland-Dozier-Holland Sound Studios*, 73 Mich App 12, 17-18; 250 NW2d 532 (1976). In this case, there was no evidence of consideration being provided to Kathleen or Vernon in exchange for discharge of the $10,000 debt, and there was no evidence of a writing that revealed that the loan had been forgiven or discharged. Accordingly, we hold that the debt owed under the verbal loan agreement was not discharged or forgiven; therefore, the probate court did not err by ruling that the loan remained due and owing.

With respect to Stephenson's argument under Article Four, Section G that the loan was discharged or forgiven because his parents did not attach a list to the Trust showing the loan, which was necessary to have the loan treated as an advance against his inheritance, we first note that Stephenson does not explain how the argument overcomes the application of MCL 566.1. Moreover, Article Four, Section G has prefatory language that triggers its application "*if* the Trustmakers keep a record of specific loans to beneficiaries . . . ." (Emphasis added.) And Stephenson does not point to any evidence that Vernon and Kathleen kept such a record.

Finally, even the testimony by Stephenson that his parents never requested repayment of the loan is woefully weak to demonstrate forgiveness or discharge of the loan, especially in light of Christina's testimony that Kathleen complained about Stephenson's failure to repay the loan. In sum, the probate court did not err by finding that the $10,000 debt had not been discharged or forgiven. Reversal is unwarranted.

## D.  COMMON LAW AND STATUTORY CONVERSION AND TREBLE DAMAGES

### 1.  THE PROBATE COURT'S RULING

Christina pursued common-law and statutory conversion claims against Stephenson. The probate court first found that no valid conversion claim could be premised on the $120,000 promissory note or the $10,000 loan obligation. The court then considered the $54,787.98 amount that was improperly disbursed or gifted by Randal Stephenson after the death of his parents. The probate court ruled:

> [R]andal intentionally dispossessed the Trust assets from Christina Smith, intentionally used the Trust assets without the authority to do so, and/or received the monies for his personal use. . . . Christina Smith is entitled to a specified percentage distribution either under the original Trust or the purported Trust amendment.
>
> * * *
>
> Here, Randal made various distributions to himself that clearly was a self-benefit, but also to his children, which alleviated the need for Randal to pay for their schooling/tuition, health, education, support, etc. Thus, the act of using the Trust funds was for Randal's own use, as he benefitted of not having to pay from his own monies, despite possibly receiving said monies as a disbursement consistent with Article One, Section J and Article Two of the Trust.
>
> In sum, Randal did commit common law and statutory conversion as it relates to the disbursement[s]/gifts made after Vernon's death. Therefore, $54,787.98 shall be multiplied three times and then paid to [Christina] by Randal Stephenson . . . .

In its order on the parties' motions for clarification and reconsideration, the probate court remained firm in its position that Stephenson had engaged in common-law and statutory

conversion with respect to the disbursements and gifts made after his father's death and that treble damages were appropriate. But there was one modification, which was as follows:

> The Court does find that the most proper recipient of the conversion damages would be the estate. The estate itself was the entity harmed, not Christina Smith. The Court does not find that damages should be reduced or offset simply because Randal would be a beneficiary—he will receive his share consistent with the terms of the Trust.

## 2. THE PARTIES' ARGUMENTS

On appeal, Stephenson argues that if or assuming that the distributions or gifts made after Vernon's death were unauthorized, the probate court erred by finding that the actions in making these distributions and gifts constituted common-law and statutory conversion. He asserts that common-law and statutory conversion required proof that he exercised dominion and control over the post-death transfers absent the consent of the Trust or the trust-makers and that he used those funds for his own personal benefit. Stephenson contends, however, that his parents, who created the Trust, explicitly consented to Stephenson's exercising dominion and control over the at-issue funds when they appointed him as the successor trustee. Accordingly, conversion was not and could not be established.

Stephenson further argues that his DPOA explicitly empowered him to engage in self-dealing with respect to making gifts, which this Court expressly acknowledged in the previous appeal. The same language in the DPOA is contained in Article Four, Section G, and, therefore, according to Stephenson, he was authorized to engage in self-dealing. Additionally, Stephenson maintains that because the Smiths were mere beneficiaries of the Trust and did not have actual ownership interests in the Trust's assets, a conversion claim was unsustainable. Stephenson next asserts that the probate court erred by finding that the distributions to his children were for Stephenson's own benefit where the distributions obviated the need for Stephenson to pay for his children's tuition, health, education, and support. Stephenson argues that there was no evidence whatsoever that he was personally obligated under the law to cover such expenses incurred by his children. Stephenson does concede that $15,678.91 of the $54,787.98 distributed after Vernon's death went directly to his own coffers, solely benefiting himself. Accordingly, Stephenson states that the probate court abused its discretion when it trebled the amounts distributed to Stephenson's children.

Stephenson also points out that the distributions and gifts that he made to himself and his children after Vernon's death could not be entirely improper under the probate court's own reasoning because Stephenson and his children were beneficiaries of the Trust entitled to certain percentages under Attachment A, yet the court effectively ruled that the entire $54,787.98 was converted, which amount in turn was trebled. If one accepts the provisions in the 2010 Trust, and not the 2014 amended Trust, 62.5% of the Trust estate was to go to Stephenson and his two children, and even if the amendment were taken into consideration, 56.25% of the Trust estate would still go to Stephenson and his children. But, once again, the probate court found that Stephenson had converted the entire amount transferred after his father's death, which necessarily constituted error. Finally, Stephenson argues that statutory conversion, which provides for treble damages, requires proof of actual knowledge of converting activity. Yet the uncontradicted

evidence at trial established that Stephenson honestly and genuinely believed that he had the authority under the Trust to make distributions and gifts to himself and his children following Vernon's death.[10] There was no evidence, according to Stephenson, that he had the requisite actual knowledge that his actions amounted to conversion.

In response, the Smiths argue that the amounts distributed or gifted by Stephenson after his father's death were for his own benefit, as he would have been obligated to cover his children's educational expenses.[11] The Smiths next note that the Estates and Protected Individuals Code (EPIC), MCL 700.1101 *et seq.*, and the general law could be employed in this case to sue fiduciary Stephenson for conversion in relation to the distributions that he made after his father's death. They argue that Stephenson's contention that his parents explicitly consented to his exercising dominion and control over Trust funds fails because it does not take into consideration the plain, unambiguous, and specific language of the Trust that dictated that he disburse the funds upon the survivor's death, i.e., Vernon's death, consistent with Attachment A, which he absolutely did not do. Finally, the Smiths address Stephenson's arguments that he did not have actual knowledge that he was converting funds and that the evidence at trial established that Stephenson honestly and genuinely believed that he had the authority under the Trust to make distributions and gifts to himself and his children following his father's death. The Smiths maintain that contrary to Stephenson's claim, he knowingly did not abide by his mother's directive or the Trust, considering that he distributed or gifted $201,681.30 to himself and his children after his mother's death and before his father died without holding on to the funds in case his father had needed them. We note that the Smiths do not confront Stephenson's argument that even if a conversion did occur, there was necessarily no conversion of amounts that Stephenson and his children were entitled to after Vernon's death under Attachment A.

### 3. DISCUSSION AND RESOLUTION

Common-law and statutory conversion are similarly defined as any distinct act involving the wrongful exertion of dominion and control over the personal property of another in denial of or inconsistent with the owner's rights therein. *Magley v M & W Inc*, 325 Mich App 307, 314; 926 NW2d 1 (2018). Our Supreme Court summarized that "[w]hile the tort of conversion originally required a separate showing that the converter made some use of the property that amounted to a total deprivation of that property to its owner, by the twentieth century common-law conversion more broadly encompassed any conduct inconsistent with the owner's property rights." *Aroma Wines & Equip, Inc v Columbian Distrib Servs, Inc*, 497 Mich 337, 353; 871

---

[10] Stephenson claims that his belief that he had the authority to make the distributions and gifts arose from (1) his own reading of the language of the Trust given that he is an attorney, (2) his mother's directive from her hospital bed to use the funds for his children's schooling and well-being absent any distribution to Christina, and (3) a letter from attorney Lawson indicating that Stephenson had the authority to make the transfers to himself and his children.

[11] The Smiths state that Stephenson himself acknowledges that $15,678.91 of the distributions made after his father's death went directly to Stephenson for his own personal benefit.

NW2d 136 (2015). Treble damages for statutory conversion are available pursuant to MCL 600.2919a, which provides, in pertinent part:

> (1) A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:
>
> (a) Another person's stealing or embezzling property or converting property to the other person's own use.
>
> * * *
>
> (2) The remedy provided by this section is in addition to any other right or remedy the person may have at law or otherwise.

A party claiming statutory conversion must establish—in addition to the common-law elements of conversion noted above—that the converted property was for the defendant's own use. *Magley*, 325 Mich App at 314 n 3. A plaintiff alleging statutory conversion under MCL 600.2919a(1)(a) must prove that the defendant used or employed the converted property for some purpose that was personal to the defendant's interests, even if that purpose was not the ordinarily-intended purpose of the object. *Aroma Wines*, 497 Mich at 359; *Magley*, 325 Mich App at 314 n 3.

The tort of conversion is an intentional tort, and the converter's *actions* must be willful. *Magley*, 325 Mich App at 314-315. But conversion can be unwittingly committed such as where a defendant is unaware of a plaintiff's outstanding property interest. *Id.* at 315. "Good faith, mistake, and ignorance are not defenses to a claim of conversion." *Id.* It is not a defense to a conversion claim that one believed that he or she was acting pursuant to lawful authority. *Id.* For example, absent consideration of governmental immunity, a sheriff or court officer is liable for conversion for unlawfully seizing personal property, even if the individual did so in the execution of a court order. *Id.*

In this case, the analysis regarding whether a conversion occurred is only truly relevant for purposes of determining whether "damages" should be trebled under MCL 600.2919a. The probate court relied on MCL 600.2919a, but it also cited a provision in the MTC, specifically MCL 700.7813(4), which provides:

> If a person embezzles or wrongfully converts trust property, or refuses, without colorable claim of right, to transfer possession of trust property to the current trustee upon demand, the person is liable in an action brought by the current trustee, or the beneficiary of the trust for the benefit of the trust, for double the value of any property embezzled, converted, or wrongfully withheld from the current trustee.

Although MCL 700.7813(4) provides for doubling the value of the converted property, the probate court determined that it had the discretion to treble damages under MCL 600.2919a. We do not believe that MCL 700.7813(4) applies in this case because its plain and unambiguous

-16-

language indicates that it encompasses circumstances in which property is "embezzled, converted, or wrongfully withheld *from the current trustee*." (Emphasis added.) In this case, successor trustee Stephenson was accused of converting trust assets. Our view is also supported by the fact that MCL 700.7813(4) is included in Part 8 of the MTC, but it is Part 9 of the MTC, MCL 700.7901 *et seq.*, that addresses the liability of *trustees* and the rights of persons dealing with trustees.

In general, EPIC provides that "[a] violation by a fiduciary of a duty the fiduciary owes to an heir, devisee, beneficiary, protected individual, or ward for whom the person is a fiduciary is a breach of duty" that can be remedied, in part, by compelling the fiduciary to redress the breach "by paying money, restoring property, or other means." MCL 700.1308(1)(c). With respect to duties owed by trustees, a "trustee shall administer [a] trust in good faith, expeditiously, *in accordance with its terms and purposes*, for the benefit of the trust beneficiaries, and in accordance with this article." MCL 700.7801 (emphasis added). And "[a] violation by a trustee of a duty the trustee owes to a trust beneficiary is a breach of trust" that can be remedied, in part, by compelling the trustee to redress the breach "by paying money, restoring property, or other means." MCL 700.7901(1)(c). Moreover, MCL 700.7902 provides:

> A trustee who commits a breach of trust is liable to the trust beneficiaries affected for whichever of the following is larger:
>
> (a) The amount required to restore the value of the trust property and trust distributions to what they would have been had the breach not occurred.
>
> (b) The profit the trustee made by reason of the breach.

There is nothing in Part 9 of the MTC suggesting that a trustee who committed a breach of trust by, for example, failing to act in accordance with the terms of a trust, is subject to the doubling or trebling of amounts "required to restore the value of the trust property and trust distributions to what they would have been had the breach not occurred." MCL 700.7902(a). Nevertheless, we cannot ignore the clear legislative intent as discerned from the plain and unambiguous language of MCL 600.2919a(2), which provides that "[t]he remedy provided by this section is *in addition to* any other right or remedy the person may have *at law or otherwise*." (Emphasis added.)[12] Accordingly, the Smiths or the Trust had a potential remedy of treble damages under MCL 600.2919a in addition to the remedies under the MTC.

The probate court and the Smiths relied on the "converting property" provision in MCL 600.2919a(1)(a).[13] We have already discussed the elements of statutory conversion, which are the

---

[12] We also note that MCL 700.7901(2)(j) provides that a court may remedy a breach of trust by entering an order granting "any . . . appropriate relief."

[13] We do note that MCL 600.2919a(1)(a) also contains an "embezzling property" provision. "Embezzlement may be defined broadly as the fraudulent appropriation of another's property by a person to whom it has been intrusted or into whose hands it has lawfully come." *American Life Ins Co v United States Fidelity & Guaranty Co*, 261 Mich 221, 224; 246 NW 71 (1933) (quotation

same as the elements of common-law conversion, with the additional element that requires proof that the property was converted for the "person's own use," MCL 600.2919a(1)(a), i.e., some purpose that was personal to a defendant's interests, *Aroma Wines*, 497 Mich at 359; *Magley*, 325 Mich App at 314 n 3.

We generally agree with the probate court that the facts of this case fit within the parameters of statutory conversion. After Vernon died, trustee Stephenson was required to disburse the net proceeds of the Trust pursuant to Attachment A. We conclude that when Stephenson disbursed the net proceeds to himself and his children to the exclusion of the Smiths and in violation of Attachment A, Stephenson effectively engaged in distinct acts involving the wrongful exertion of dominion and control over the personal property of another: The "another" can be viewed as either the Trust or the Smiths. But there is a caveat to our ruling, in that we additionally find that the disbursements were not in complete violation of Attachment A, considering that, minimally, Stephenson and his children were entitled to 56.25% of the net proceeds. There could be no actionable conversion when Stephenson transferred Trust assets to himself and his children in accordance with Attachment A, even though in his mind, he was acting pursuant to Article Four, Sections D and G. But actionable conversion did occur when Stephenson made transfers that exceeded amounts or percentages allowed under Attachment A. And those particular Trust assets in excess of what Stephenson and his children were entitled to under Attachment A represented converted property that was subject to treble damages. We thus conclude that the probate court erred by trebling the full $54,787.98. Aside from this ruling, we otherwise reject Stephenson's appellate arguments on this issue.

Stephenson contends that he exercised dominion and control over the assets of the Trust with the consent of the Trust or the trust-makers—settlors Vernon and Kathleen; therefore, there was no conversion. This argument fails because under the plain and unambiguous language of the Trust, which necessarily established the intent of Stephenson's parents, the net proceeds of the Trust were required to be disbursed in accordance with Attachment A upon the death of the survivor of Vernon and Kathleen. Stephenson did not do so; he transferred to himself and his children some assets that should have gone to the Smiths, and this action amounted to statutory conversion.

Next, Stephenson essentially repeats his argument that he was authorized under Article Four, Sections D and G of the Trust to make the transfers or disbursements at issue following Vernon's death. For the reasons discussed earlier, we reject this argument. We further reject Stephenson's contention that the conversion claim fails because the Smiths were mere beneficiaries. In support of this proposition, Stephenson cites MCL 700.7815(1), which provides that "[a] beneficiary of a discretionary trust provision . . . has no property right in a trust interest that is subject to a discretionary trust provision, and has no right to any amount of trust income or principal that may be distributed only in the exercise of the trustee's discretion." First, under the circumstances, the Trust itself could be characterized as the victim of the conversion. Second, and more importantly, when Vernon died, triggering the application of Article One, Section J; Article

---

marks and citation omitted). The Smiths, however, did not allege embezzlement, which would have required proof of a fraudulent intent. *Id.*

Two, Section A, Subsection 2.d.; and Attachment A, Stephenson no longer had any discretion: The Smiths were entitled to their share of the net proceeds of the Trust.

With respect to the issue concerning whether the conversion was for Stephenson's "own use," MCL 600.2919a(1)(a), we decline to address whether Stephenson had any obligation to pay for his children's educational or other expenses. Rather, using the Trust's assets to pay his children's educational and other expenses, relieving them of the stress and burden that go hand-in-hand with educational and other debt, constitutes, in our view, a purpose that was personal to Stephenson's interest as a parent in the well-being of his adult children.[14]

Finally, with regard to Stephenson's argument that there was no proof that he had actual knowledge that he was engaging in the tort of conversion, we again reiterate that "[g]ood faith, mistake, and ignorance are not defenses to a claim of conversion." *Magley*, 325 Mich App at 315. It simply is not a defense to a conversion claim that one believed that he or she was acting pursuant to lawful authority. *Id.* And, quite clearly, Stephenson willfully performed the act of distributing funds held by the Trust. Stephenson cites *Nedschroef Detroit Corp v Bemas Enterprises LLC*, 106 F Supp 3d 874, 886 (ED Mich, 2015), wherein the federal court stated that in order to prevail on a claim for statutory conversion under Michigan law, "a plaintiff must satisfy the elements of a common law conversion claim, as well as demonstrate that the defendant had 'actual knowledge' of the converting activity." In support of this proposition, the federal court cited *Echelon Homes, LLC v Carter Lumber Co*, 472 Mich 192; 694 NW2d 544 (2005). *Nedschroef Detroit Corp*, 106 F Supp 3d at 886. At the time *Echelon Homes* was decided, MCL 600.2919a was not designed to provide a remedy against a person who had actually stolen, embezzled, or converted property; rather, it civilly punished individuals who were in receipt of stolen, embezzled, or converted property and then caused injury to another. See 1976 PA 200; *Campbell v Sullins*, 257 Mich App 179, 191-192; 667 NW2d 887 (2003), superseded by statute in MCL 600.2919a(1)(a), as amended by 2005 PA 44. Indeed, the current language in MCL 600.2919a(1)(b) was the only provision in the statute before the 2005 amendment added the language in MCL 600.2919a(1)(a) that provides for a statutory cause of action and treble damages against the actual embezzler or converter such as Stephenson. Before and after the 2005 amendment, the language now found in MCL 600.2919a(1)(b) expressly contained and contains a "knowledge" requirement which is not found in MCL 600.2919a(1)(a).[15] Accordingly, Stephenson's "actual knowledge" argument fails.

In sum, we hold that the probate court did not err by trebling damages under MCL 600.2919a(1)(a) with respect to distributions and gifts Stephenson made following his father's

---

[14] We do keep in mind that Stephenson's children were directly entitled to their own small share of the Trust's assets.

[15] MCL 600.2919a(1)(b) provides a remedy to a person injured by

> [a]nother person's buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property when the person buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property *knew* that the property was stolen, embezzled, or converted. [Emphasis added.]

death, *except* as to those distributions and gifts that Stephenson and his children were entitled to under Attachment A.

## E.  REMOVAL OF STEPHENSON AS PERSONAL REPRESENTATIVE AND SUCCESSOR TRUSTEE

### 1.  THE PROBATE'S COURT'S RULING

Citing MCL 700.7815, the probate court found that "the distributions/gifts made after Vernon's death were done with an improper, but not dishonest, motive, and [that Stephenson] failed to exercise his own judgment in accordance with the terms and stated purpose within the four-corners of the Trust document."  Next, the probate court determined that Stephenson's "actions are considered to be a serious breach of trust, and pursuant to MCL 700.7901, such would be violative of [Stephenson's] duties to administer the trust in good faith, display impartiality between beneficiaries, and manage and administer the Trust pursuant to the Trust terms."  Additionally, the probate court, citing MCL 700.7801, ruled that Stephenson breached his duty to administer the Trust in accordance with the terms and purposes of the Trust.  The probate court concluded its ruling, stating:

> This Court takes the position that [Stephenson] may be removed as he either committed a serious breach of trust and/or the persistent failure of the trustee to administer the trust effectively and that the removal best serves the purposes of the trust. Therefore, [Stephenson] shall be removed as Trustee of the Trust.

The probate court appointed Christina as the successor trustee.  In its order on the parties' motions for clarification and reconsideration, the probate court reiterated that "Randal Stephenson was properly removed as Trustee for breach of his fiduciary duties[.]"

The probate court also removed Stephenson as the personal representative of the Estate. The court ruled:

> Here, inasmuch as the parties' relationship . . . is highly strained, and [Stephenson] being removed as trustee, that it would be in the best interests of the estate that a successor be appointed. The Court will appoint Christina . . . as successor personal representative on its own motion so that there is continuing congruency between the estate and Trust.

In its order on the parties' motions for clarification and reconsideration, the probate court reiterated that "Randal Stephenson was properly removed as personal representative."

### 2.  THE PARTIES' ARGUMENTS

Stephenson argues that he did not violate any fiduciary duties; therefore, there was no basis to remove him as successor trustee and personal representative.  Thus, according to Stephenson, the probate court abused its discretion when it removed Stephenson from these positions.  The Smiths respond by citing a litany of statutory provisions under EPIC that Stephenson allegedly violated in contravention of his obligations as a fiduciary relative to the Trust and the Estate.  The Smiths also argue that Vernon and Kathleen named Stephenson the fiduciary because he was an

attorney, that Stephenson was required to employ his legal skills, and that he did not utilize those skills.[16] The Smiths contend that Stephenson's numerous breaches of his fiduciary duties were more than sufficient to justify removing him as successor trustee and personal representative.

### 3. DISCUSSION AND RESOLUTION

"A probate court's decision whether to remove a trustee is reviewed for an abuse of discretion, as is a decision whether to remove a personal representative[.]" *In re Baldwin Trust*, 274 Mich App 387, 396-397; 733 NW2d 449 (2007). A court abuses its discretion when its ruling falls outside the range of reasonable and principled outcomes. *Id.* at 397. Among numerous grounds, a probate "court may remove a personal representative" when "[r]emoval is in the best interests of the estate," when the personal representative "[m]ismanaged the estate," or when the personal representative "[f]ailed to perform a duty pertaining to the office." MCL 700.3611(2)(a) and (c)(*iii*) and (*iv*). MCL 700.7706 provides, in pertinent part:

> (1) The settlor, a cotrustee, or a qualified trust beneficiary may request the court to remove a trustee, or a trustee may be removed by the court on its own initiative.

> (2) The court may remove a trustee if 1 or more of the following occur:

> (a) The trustee commits a serious breach of trust.

> (b) Lack of cooperation among cotrustees substantially impairs the administration of the trust.

> (c) Because of unfitness, unwillingness, or persistent failure of the trustee to administer the trust effectively, the court determines that removal of the trustee best serves the purposes of the trust.

> (d) There has been a substantial change of circumstances, the court finds that removal of the trustee best serves the interests of the trust beneficiaries and is not inconsistent with a material purpose of the trust, and a suitable cotrustee or successor trustee is available.

We hold that the probate court did not abuse its discretion when it removed Stephenson as the personal representative of the Estate and as the successor trustee of the Trust. As indicated earlier, a "trustee shall administer the trust in good faith, expeditiously, in accordance with its terms and purposes, for the benefit of the trust beneficiaries, and in accordance with this article."

---

[16] MCL 700.7803 provides:

> The trustee shall act as would a prudent person in dealing with the property of another, including following the standards of the Michigan prudent investor rule. If the trustee has special skills or is named trustee on the basis of representation of special skills or expertise, the trustee is under a duty to use those skills.

MCL 700.7801. And, once again, "[a] violation by a trustee of a duty the trustee owes to a trust beneficiary is a breach of trust." MCL 700.7901(1). The probate court may remove a trustee to remedy a breach of trust. MCL 700.7901(2)(g).

Stephenson failed to act in accordance with the plain and unambiguous language of the Trust when he distributed nearly all the Trust assets solely to himself and his children after Vernon's death, giving nothing to the Smiths. This conduct constituted a serious breach of the Trust justifying Stephenson's removal as trustee, and it was in the best interest of the Estate to also remove Stephenson as personal representative for purposes of consistency and efficiency. Furthermore, without any sound legal basis to do so, Stephenson had ignored debts to his parents and which he eventually owed to the Trust, i.e., the $10,000 loan and the $120,000 promissory note, which amounted to assets or property of the Trust. Under MCL 700.7810, "[a] trustee shall take reasonable steps to take control of and protect the trust property." And "[a] trustee shall take reasonable steps to locate trust property." MCL 700.7813(1). Stephenson's conduct or lack of action in relation to the debts constituted yet another breach of trust. Finally, we note that Stephenson's argument on this matter consists of three sentences, including one devoted to the standard of review.[17] "It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *Mudge v Macomb Co*, 458 Mich 87, 105; 580 NW2d 845 (1998) (quotation marks and citation omitted). In sum, reversal of the removal ruling is unwarranted.[18]

## F. ATTORNEY FEES AND COURT COSTS

### 1. THE PROBATE COURT'S RULING

By order dated November 17, 2021, concerning the parties' requests for attorney fees and costs, the probate court ruled "that ALL fees incurred by [Christina] shall be awarded from the Trust assets." The court further determined "that the fees[] incurred by Randal Stephenson shall be paid by Randal Stephenson and not the Trust." The order indicated that the probate court issued these rulings "for the reasons stated on the record." The order also reflected that a hearing on the issue of attorney fees and costs was held on November 15, 2021. On February 8, 2022, a stipulation and order was entered regarding the amount of attorney fees and costs. The stipulated order provided that Christina was awarded $128,492.80 in attorney fees, costs, and expenses, which amount was to be paid from the assets held by the Trust. The stipulated order additionally referenced the fact that the hearing on attorney fees and costs had been conducted on November 15, 2021.

### 2. THE PARTIES' ARGUMENTS

---

[17] The Smiths cite numerous alleged failures by Stephenson to comply with EPIC and the included MTC, but we see no need to explore all of these purported shortcomings.

[18] To the extent that Stephenson might be making the argument, we also conclude that the probate court did not err by replacing him as personal representative and successor trustee with Christina.

On appeal, Stephenson argues that the trial court abused its discretion by awarding attorney fees and costs to Christina and by denying his request for attorney fees and costs. Stephenson states that he had expended $139,414.95 in legal fees, expenses, and costs by the time of trial, none of which had been reimbursed by the Trust or the Estate. He contends that he was largely successful in the litigation because 74% of his distributions and gifts were determined to be proper, i.e., the transfers made before Vernon passed away. Stephenson notes that the fiduciary breach cited by the probate court only pertained to a fraction of the distributions. Stephenson also argues that the Smiths never even alleged in the lower court that he had acted in bad faith. He further maintains that he did not commit a breach of trust; consequently, his request for attorney fees was not subject to reduction or denial pursuant to MCL 700.7904(3). Next, Stephenson contends that Christina was not entitled to attorney fees and expenses because she was not a trustee but merely a trust beneficiary. He additionally asserts that Christina was not entitled to attorney fees and costs for the very same reasons noted above with respect to why he should have been awarded fees and expenses. Stephenson claims that he was more of a prevailing party than Christina. In conclusion, Stephenson argues that he breached no fiduciary duties and that the probate court's ruling on attorney fees, costs, and expenses was completely irrational.

In response, the Smiths essentially argue that Stephenson engaged in multiple breaches of his fiduciary duties that supported the probate court's ruling on attorney fees, costs, and expenses. The Smiths focus on Stephenson's failure to properly account for the $120,000 promissory note that was due and owing to the Estate or, by Kathleen's assignment, to the Trust. The Smiths further contend that Stephenson's representation that he was largely successful in the litigation and in defending himself against the Smiths' petition is simply inaccurate as reflected by the record. The Smiths do not elaborate on this argument or assail, citing specifics, the numbers and percentages set forth by Stephenson.[19]

### 3. DISCUSSION AND RESOLUTION

In *In re Temple Marital Trust*, 278 Mich App 122, 128; 748 NW2d 265 (2008), this Court recognized the standards of review applicable to awards of attorney fees and costs in actions under EPIC:

> [W]ith respect to an award of attorney fees, we review underlying findings of fact for clear error, while questions of law are reviewed de novo. But we review the court's decision whether to award attorney fees and the determination of the reasonableness of the fees for an abuse of discretion. The court does not abuse its discretion when its decision is within the range of reasonable and principled outcomes. [Citations omitted.]

---

[19] The Smiths note that Stephenson complained at trial that the aggregate legal expenses connected to the litigation exceeded the total value of the Trust, which was nonsensical. The Smiths now state that the expenses were completely avoidable had Stephenson fairly and properly performed his fiduciary duties.

With respect to an award of attorney fees and costs under the MTC, MCL 700.7904 provides:

> (1) In a proceeding involving the administration of a trust, the court, as justice and equity require, may award costs and expenses, including reasonable attorney fees, to any party who enhances, preserves, or protects trust property, to be paid from the trust that is the subject of the proceeding.

> (2) Subject to subsection (3), if a trustee participates in a civil action or proceeding in good faith, whether successful or not, the trustee is entitled to receive from trust property all expenses and disbursements including reasonable attorney fees that the trustee incurs in connection with its participation.

> (3) A court may reduce or deny a trustee's claim for compensation, expenses, or disbursements with respect to a breach of trust.

"Attorney fees incurred by an executor to defend against a petition for his removal are properly chargeable against the estate where no wrongdoing is proven." *In re Hammond Estate*, 215 Mich App 379, 387; 547 NW2d 36 (1996).[20]

We initially note that a problem with Stephenson's argument is that the probate court's reasoning behind its rulings on attorney fees and costs was set forth on the record at the hearing on November 15, 2021. But, there is no transcript of this hearing in the lower court record, nor is there any indication that a transcript of the hearing was ordered. "The appellant is responsible for securing the filing of the transcript as provided in this rule." MCR 7.210(B)(1)(a). And MCR 7.210(B)(1)(b) provides that "[i]n an appeal from probate court in an estate or trust proceeding, . . . only that portion of the transcript concerning the order appealed from need be filed[,]" and "[t]he appellee may file additional portions of the transcript." "[T]his Court will refuse to consider issues for which the appellant failed to produce the transcript." *PT Today, Inc v Comm'r of the Office of Fin & Ins Servs*, 270 Mich App 110, 151-152; 715 NW2d 398 (2006).

Nevertheless, even without the transcript and some insight into the probate court's reasoning for its rulings on attorney fees and costs, we are compelled to conclude that the probate court abused its discretion. From an overall perspective, the Smiths were successful with respect to having $130,000 in loans to Stephenson and his wife included as a debt owed to the Trust,

---

[20] We note that the Smiths cite some provisions in the Uniform Trust Code; however, in enacting the MTC, our Legislature only adopted some of the provisions found in the Uniform Trust Code. See Harder, *Introducing the Michigan Trust Code*, 89 Mich B J 24 (2010) ("The result of a five-year drafting effort, the MTC relies on the structure and provisions of the Uniform Trust Code [UTC] as the starting point for many of its provisions. However, the MTC is a uniquely Michigan document that draws from both the UTC and existing Michigan law to preserve long-established procedures, practices, and principles concerning trusts in Michigan while also filling the numerous gaps that have existed."). The MTC and other provisions contained within EPIC govern our analysis.

effectively increasing the Trust's assets. Moreover, they successfully litigated the issue concerning the $54,787.98 that Stephenson distributed or gifted to himself and his children after Vernon's death. The probate court also removed Stephenson as the personal representative and successor trustee and replaced him in those roles with Christina. On the other hand, with regard to the majority or bulk of the distributions or gifts Stephenson made to himself and his children, i.e., those made before Vernon's death, they were determined to be proper transfers.[21] Under these circumstances, the probate court's rulings that Stephenson was responsible for all of his attorney fees and costs and that the Smiths were entitled to $128,492.80 from the Trust to cover all of their fees and costs were patently not just and equitable and amounted to an abuse of discretion. We hold that the probate court's determinations did not fall within the range of reasonable and principled outcomes.

Once again, MCL 700.7904(1) provides that "[i]n a proceeding involving the administration of a trust, the court, as justice and equity require, may award costs and expenses, including reasonable attorney fees, to any party who enhances, preserves, or protects trust property, to be paid from the trust that is the subject of the proceeding." First, contrary to Stephenson's argument that the Smiths could not recover attorney fees and costs because they were merely beneficiaries, MCL 700.7904(1) plainly authorizes a probate court to award a beneficiary attorney fees and costs if the subsection is otherwise applicable. Moreover, in light of the loans brought to the court's attention and the improper distributions following Vernon's death, the Smiths enhanced, preserved, and protected trust property. Justice and equity entitled the Smiths to attorney fees and costs paid by the Trust, but not to the full extent of their incurred fees and costs given that Stephenson was successful in the litigation with regard to distributions made before Vernon's death.

Further, under MCL 700.7904(2) and (3), considering the breaches of trust Stephenson committed as discussed earlier in this opinion, Stephenson was not entitled to be reimbursed for all of his attorney fees and costs associated with the litigation even if he acted in good faith and despite some success in the case. But the breaches of trust did not encompass or concern all of the Trust's assets; therefore, Stephenson was entitled to some just and equitable reimbursement from the Trust for his attorney fees and costs. On remand for recalculating the Smiths' and Stephenson's attorney fees, the probate court "as justice and equity require" may approve fees to be paid from the Trust that a party enhanced, preserved, or protected pursuant to MCL 700.7904(1), before granting reasonable fees to a trustee participating in a civil action as reduced for the breach of trust, pursuant to MCL 700.7904(2) and (3).

---

[21] To be clear, we are not ruling that the distributions and gifts made by Stephenson before his father passed away were legally valid. Rather, with one small exception raised by the Smiths on cross-appeal that we address and reject *infra,* the Smiths are not challenging the probate court's ruling with respect to distributions made before Vernon's death. Therefore, we must treat the pre-death distributions and gifts as being legally sound.

In sum, we reverse the probate court's ruling regarding attorney fees and costs and remand for awards that are consistent with justice and equity under the circumstances and results of the litigation.

## G. VALIDITY OF TRUST AMENDMENT AND INCREASE IN BENEFICIARY SHARE

### 1. THE PROBATE COURT'S RULING

This issue concerns the 2014 amendment of the Trust by Kathleen Stephenson, which effectively increased Christina's beneficiary share of the Trust estate from 25% to 37.5%. The issue that arose was whether Christina exercised undue influence over her mother to procure the amendment. The probate court first determined that it was not persuaded that the relationship between Christina and her mother Kathleen "was one that met the requirements of creating a presumption of undue influence." The court found that there was insufficient evidence showing that the Trust amendment occurred as a result of undue influence. The probate court noted that there was conflicting evidence regarding why Kathleen had amended the Trust; however, attorney Lawson, who drafted the amendment, indicated "that Kathleen seemed to be of sound mind and [was] otherwise able to conduct her own affairs." Accordingly, the probate court declared that the first amendment of the Trust was valid and enforceable. In its order on the parties' motions for clarification and reconsideration, the probate court, citing the 2014 Trust amendment, ruled that "Christina Smith's share is 37.5%, not 25%."

### 2. THE PARTIES' ARGUMENTS

Stephenson argues that the 2014 amendment of the Trust was invalid and unenforceable. He contends that the evidence absolutely established the three elements to give rise to a presumption of undue influence and that the probate court erred by ruling to the contrary. According to Stephenson, the evidence pointed to suspicious and deceptive practices by Christina that procured the changes in the Trust by Kathleen the day before a surgical procedure and shortly before Kathleen's passing. And the deception and suspiciousness were further reflected in the fact that Christina did not reveal the amendment to Stephenson until September 2018 in the midst of discovery in the probate litigation.

In response, the Smiths argue that the testimony at trial established that when the amendment was executed in February 2014, Christina was taking care of the day-to-day needs and requirements of her parents and that it had become difficult to deal with their health and financial decisions absent the legal authority to do so, given that Stephenson lived out of state.[22] The Smiths contend in their appellate brief that Christina did not even learn of the 2010 estate planning documents until 2014 when her mother first told her about the documents. The Smiths maintain that Christina testified that she never asked her mother why she was getting less than Stephenson under the Trust, which she assumed occurred because in 2010 her mother became irritated with

---

[22] As noted earlier, a new DPOA for Kathleen was also executed at the time, providing authority to Christina to act as Kathleen's attorney-in-fact.

Christina when Christina and her husband went to Florida for the winter, straining the mother-daughter relationship for over a year.

The Smiths further assert that the testimony established that the amendment was instigated at Kathleen's insistence, that attorney Lawson believed that the amendment was undertaken because Kathleen wanted to treat her children more equally, and that attorney Lawson believed that, notwithstanding her fragility, Kathleen had the requisite state of mind to make the amendment and was not under any undue influence. The Smiths maintain that all of the surrounding circumstances demonstrated that there was no undue influence and no basis whatsoever to conclude that a presumption of undue influence arose. They argue that this issue is not resolved by examining whether there was an opportunity to impose undue influence but by determining whether that opportunity had actually been exerted such that documents would have been executed by Kathleen against her free will. Continuing this line of argument, the Smiths claim that Christina's and Lawson's testimonies "confirmed that Kathleen was a strong-will, powerful person who would not be easily manipulated or unduly influenced from making her own informed decisions." Finally, with respect to Stephenson's contention that he only learned of the amendment after the litigation commenced, the Smiths posit that the assertion is belied by the fact that he earlier executed documents alluding to the Trust, "as amended," and that attorney Lawson testified that he e-mailed the amendment to Stephenson using the e-address on Stephenson's business card.

## 3. DISCUSSION AND RESOLUTION

There is no dispute that the Trust was actually amended in 2014 by Kathleen, increasing Christina's share of the net proceeds of the Trust estate from 25% to 37.5%. The issue is whether Christina exerted undue influence over her mother in an effort to procure the amendment. EPIC was designed, in part, to assist in the discovery of and to effectuate a decedent's intent with respect to the distribution of the decedent's assets, "but this purpose long predates EPIC and is entrenched deeply within the history of this state's probate law." *In re Mardigian Estate*, 502 Mich 154, 159; 917 NW2d 325 (2018), citing MCL 700.1201(b). Undue influence destroys the free agency of the testator or settlor at the time when an instrument is made, effectively substituting the will of another for that of the testator or settlor. *Mardigian Estate*, 502 Mich at 160. The burden of establishing undue influence rests with the party asserting it. *Id.* In *In re Karmey Estate*, 468 Mich 68, 75; 658 NW2d 796 (2003), our Supreme Court observed:

> To establish undue influence it must be shown that the grantor was subjected to threats, misrepresentation, undue flattery, fraud, or physical or moral coercion sufficient to overpower volition, destroy free agency and impel the grantor to act against his inclination and free will. Motive, opportunity, or even ability to control, in the absence of affirmative evidence that it was exercised, are not sufficient. [Quotation marks and citation omitted.]

"A presumption of undue influence arises upon the introduction of evidence that would establish (1) the existence of a confidential or fiduciary relationship between the grantor and a fiduciary, (2) the fiduciary, or an interest represented by the fiduciary, benefits from a transaction, and (3) the fiduciary had an opportunity to influence the grantor's decision in that transaction." *In re Erickson Estate*, 202 Mich App 329, 331; 508 NW2d 181 (1993) (citation omitted). The presumption is rebuttable, but "even when a rebuttable presumption of undue influence has arisen,

. . . it does not shift the ultimate burden of proof; rather, that burden always remains with the contestant." *Mardigian Estate*, 502 Mich at 164.

With respect to any presumption of undue influence, Christina clearly benefited from the Trust amendment, and she plainly had an opportunity to influence her mother's decision to amend the Trust because Christina had moved into her mother's home to care for her following Kathleen's heart attack, during which period the amendment was executed. The only other question is whether there existed a confidential or fiduciary relationship between Christina and Kathleen. The Smiths ignore the issue, and Stephenson contends that a fiduciary relationship existed because at the time of the amendment, Kathleen also executed a new DPOA granting Christina power to act as Kathleen's attorney-in-fact. The probate court was not persuaded that the requisite relationship existed. We agree with the probate court. The DPOA did create a fiduciary relationship. *In re Susser Estate*, 254 Mich App 232, 235; 657 NW2d 147 (2002).[23] But the new DPOA and the Trust amendment were executed on the same date at nearly the same time; therefore, there was no existing confidential or fiduciary relationship. Accordingly, a presumption of undue influence did not arise. Moreover, the probate court did not clearly err by concluding that Stephenson had failed to demonstrate that the Trust amendment was procured by undue influence exerted by Christina upon her mother.

Attorney Lawson testified that Kathleen had suffered a heart attack in January 2014 and that Christina had contacted him in February 2014 to go over various issues, including the subjects of insurance, Medicaid, Kathleen's DPOA, and changes to the Trust. Lawson had never previously met Kathleen, but he did know Christina through her husband, whom Lawson had known for years in relation to business matters. Lawson testified that he met with Kathleen and Christina together at his law office and that after they had discussed several topics, he excused Christina from the room and met privately with Kathleen to review matters. Lawson explained that Kathleen wanted a more equal distribution between Stephenson and Christina. Attorney Lawson insisted that he had no concerns or worries about Kathleen being pressured into amending the Trust. On questioning by the probate court, Lawson indicated that Kathleen had "a powerful personality" and that although she was fragile and had health issues, she knew what she was doing and there was no indication that Kathleen had been coerced or forced into amending the Trust.

Christina, who first learned of the 2010 estate planning documents in 2014, testified that while she made calls to attorney Lawson given her mother's ill health that resulted from her heart attack, Kathleen truly wanted the change made to the Trust. According to Christina, she and her mother had a past falling out, but they became close as Christina took care of her mother in her mother's home after Kathleen's heart attack. Christina explained that her mother believed that Christina should become familiarized with the estate planning documents, which led to Kathleen's showing the documents to Christina. And Kathleen purportedly told Christina that she wanted a more equal distribution under the Trust. Christina also testified that she and her mother agreed that a new DPOA was needed to allow Christina to handle matters for her ailing mother. Christina

---

[23] "In cases involving conveyances from parent to child there is a rebuttable presumption of undue influence only where a fiduciary relationship is found to exist." *Mannausa v Mannausa*, 370 Mich 180, 184; 121 NW2d 423 (1963).

denied that Kathleen made the change to the Trust because Christina had threatened to stop caring for Kathleen if she did not agree to the amendment.

Stephenson testified that his mother had contacted him by phone in January 2014, indicating that she was not comfortable meeting with the attorney, that she did not wish to make changes to the estate planning documents, and that she wanted Stephenson to be present. Stephenson also testified that Christina never informed him about the meeting with attorney Lawson wherein Kathleen made the changes to the Trust. Stephenson claimed that he flew into town and met with Christina, Kathleen, and another attorney at Lawson's office before the Trust was amended. Stephenson testified that Kathleen reiterated her wishes and concerns to him and that, at the time, there was no agreement to make any changes to the Trust. Stephenson therefore returned to New York. He was unaware that a meeting subsequently took place in February 2014, in which his mother executed the Trust amendment.

The probate court was faced with competing narratives, and it chose to believe attorney Lawson's testimony, which aligned with Christina's testimony. Effectively, the probate court did not find Stephenson to be credible with respect to Kathleen's mindset and intent. As noted earlier, we defer to the probate court regarding the assessment of credibility because of its unique vantage point relative to witnesses, their testimony, and other influencing factors not readily available to this panel. *Conservatorship of Brody*, 321 Mich App at 336. We have no basis to disregard the probate court's credibility determinations. In short, we hold that the probate court did not clearly err by finding that Kathleen amended the Trust by her own free will and absent any undue influence from Christina. Accordingly, the 2014 amendment of the Trust was valid and enforceable.

## H. CROSS-APPEAL ISSUE

With respect to the Smiths' cross-appeal, they argue that in calendar year 2014, which was prior to Vernon's death, Stephenson had gifted himself $25,009.65 under Article Four, Section G of the Trust. This amount, according to the Smiths, was $11,009.65 over the $14,000 annual gift exclusion allowed by IRC § 2503(b). Therefore, Stephenson had converted $11,009.65, which amount must be trebled under MCL 600.2919a; the product is $33,028.95. Accordingly, the Smiths maintain that Stephenson should be ordered, in addition to the trebled damages relative to the distributions made after Vernon's death, to pay $33,028.95 to the Trust.

Stephenson argues that the Smiths did not file a cross-appeal; therefore, the issue is not properly before this Court. Stephenson then contends that the argument lacks substantive merit, but he fails to directly counter the Smiths' position under IRC § 2503(b).

Contrary to Stephenson's contention, the Smiths did indeed file a claim of cross-appeal with this Court on March 18, 2022. Nonetheless, we reject the Smiths' argument. The trial exhibit that the Smiths rely on did indicate that Stephenson had distributed to himself $25,009.65 in 2014. In their appellate brief, the Smiths describe the 2014 distributions as gifts; however, the trial exhibit described the distributions as being "[f]or the Benefit of . . . Stephenson." Therefore, these distributions fit within the authority of Article Four, Section D, which did not contain the IRC limitations found in Section G. In the first appeal, this Court ruled:

The probate court . . . erred by determining that the gift-giving provision of Article Four, Section G controlled over Article Four, Section D. Article Four, Section G, by its terms, applied only to *gifts* made to [Stephenson] or third parties, whereas Article Four, Section D permitted respondent to use his discretion when distributing Trust assets for the *benefit* of the beneficiaries, which included himself and his children. [*In re Vernon Stephenson Estate*, unpub op at 7 (emphasis in original).]

Although we are compelled by the law-of-the-case doctrine to abide by this determination by the previous panel, we also agree with this construction of Sections D and G of Article Four of the Trust. In light of the trial exhibit referencing 2014 distributions made for the *benefit* of Stephenson and the plain and unambiguous language of Article Four, Sections D and G, the Smiths' argument that the distributions exceeded the limits of IRC § 2503(b) fails as does the associated trebling argument. IRC § 2503(b) was simply not applicable. We thus hold that the argument on cross-appeal fails.

## V. CONCLUSION

We hold that the probate court did not err by ruling that distributions and gifts Stephenson made after his father's death did not comply with the requirements of the Trust, that the court did not err by trebling damages in relation to those post-death transfers except to the extent that Stephenson and his children were entitled to those assets under Attachment A as amended, and that the court did not err by finding that the $10,000 verbal loan was not discharged or forgiven. We further hold that the probate court did not abuse its discretion by removing Stephenson as the personal representative and successor trustee and replacing him in those roles with Christina, that the court did err and abused its discretion with respect to its ruling on attorney fees and costs, that the court did not err by finding that the 2014 amendment to the Trust was valid and enforceable, and that the court did not err by failing to find that 2014 distributions to Stephenson were in violation of Article Four, Section G of the Trust and IRC § 2503(b). On a final note, the probate court made findings and rulings after trial on various issues that have not been appealed by the parties. Consequently, those findings and rulings stand.

We affirm in part and reverse and remand in part for proceedings consistent with this opinion. We do not retain jurisdiction. No party having fully prevailed on appeal, we decline to tax costs under MCR 7.219.

/s/ Jane E. Markey
/s/ Christopher M. Murray
/s/ Kathleen A. Feeney

-30-